## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLARA WEIDL,               )
                                 )
       Plaintiff,         )
                                 )
       vs.               )     2:07cv531
                                 )     **Electronic Filing**
COMMISSIONER OF SOCIAL    )
SECURITY,                )
                                 )
       Defendant.     )

### MEMORANDUM OPINION

August 21, 2008

## I. INTRODUCTION

Plaintiff, Clara Weidl ("Plaintiff" of "Weidl") brought this action pursuant to 42 U.S.C. § 405(g), for review of the final determination of the Commissioner of Social Security ("Commissioner") denying her application pursuant to the Social Security Act ("Act") for Disability Insurance Benefits ("DIB"). As is the customary practice in the Western District of Pennsylvania, the parties have submitted cross-motions for summary judgment and the record was developed at the administrative proceedings.

After careful consideration of the decision of the Administrative Law Judge ("ALJ"), the briefs and reply briefs of the parties, and the entire record, the Court finds that the decision of the Commissioner is supported by substantial evidence and therefore will deny Plaintiff's motion for summary judgment and grant the Commissioner's motion for summary judgment.

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on March 12, 2004, alleging disability as of September 5, 2003 due to stomach ulcers, anemia, and stress. (R. 67-87). The state agency denied her claim on May 19, 2004. (R. 35-40). This case was then randomly selected by the Commissioner to test modifications to the disability determination process, so the reconsideration step of the administrative review process was eliminated and the case was escalated to the hearing level. (R. 35). A hearing was held before ALJ Douglas W. Abruzzo on

December 5, 2005 where Plaintiff, who was represented by counsel, and an impartial vocational expert testified. (R. 353-407). On February 21, 2006, the ALJ issued a decision in which he determined that Plaintiff was not disabled. (R. 17-28). On February 23, 2007, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 5-8). Plaintiff then filed her complaint and appeal with this Court.

## III. STATEMENT OF THE CASE

On January 29, 2002, an esophagogastro-duodenoscopy (EGD) was performed on Plaintiff by Dr. Jae Yang that showed mild gastroesophageal reflux disease but no ulcer. (R. 139). On November 24, 2002, Plaintiff was seen at the Armstrong County Memorial Hospital for stomach pain and reported that she had mild nausea, vomiting, and some diarrhea. (R.146).

Plaintiff was then seen by her family doctor, Dr. Philip A. Gelacek, between March 5, 2003 and September 9, 2004 for complaints of indigestion and abdominal pain. Her first visit to Dr. Gelacek's office was on March 5, 2003 at which time Plaintiff was treated with Nexium for acid reflux and blood work was ordered. (R. 197). On April 21, 2003, Plaintiff reported doing much better on Nexium, but her blood work was positive for H. Pylori, so Dr. Gelacek recommended "triple therapy" antibiotic treatment. (R. 195). He also suggested that she take Tylenol for complaints of lower back pain. (R. 195). On May 22, 2003, Plaintiff returned and reported improvement since completing the triple therapy. (R. 194). Dr. Gelacek indicated that a bone density study revealed osteopenia and he started her on Actonel and OS-Cal with Vitamin D. (R. 194).

On June 13, 2003, Plaintiff returned to Dr. Gelacek complaining of stomach pains since beginning the Actonel. (R.193). Dr. Gelacek suggested that the triple therapy be repeated and that an abdominal ultrasound of the upper GI be performed. *Id.* Her abdominal ultrasound was normal with the UGI showing mild gastroesophageal reflux. (R. 202-203). Dr. Gelacek then recommended a CT scan of Plaintiff's abdomen and pelvis, a CCK Heptobiliary scan, and an endoscopy. (R. 193). The CT scan of the gallbladder was normal as was that of the pelvis except for asplenia or splenectomy. (R. 201). An endoscopy was performed by Dr. Yang during

2

which he found a large, very hard gastric ulcer which was biopsied. The tissue sample was inconclusive of a diagnosis of gastric carcinoma. (R. 158-59). Another endoscopy was performed where the same ulcer was observed. Dr. Yang indicated that "the ulcer looks cleaner since one month of treatment, it looks like more ulcer than cancer but still cancer cannot be ruled out." (R. 169).

On December 3, 2003, Dr. Gelacek noted that Plaintiff was doing a lot better but was continuing to have pain when eating certain foods. Plaintiff requested referral to a specialist because the second endoscopy by Dr. Yang did not rule out cancer. (R. 191). Plaintiff was referred to Dr. Lipsitz. (R. 191). On March 3, 2004, Dr. Gelacek noted that Plaintiff was taking two aspirin tablets daily for headaches and this intake was likely contributing to her abdominal difficulties. (R. 190). It was requested that Plaintiff stop taking the aspirin. Plaintiff was also prescribed Lexapro because Dr. Gelacek "[thought] she was suffering from depression." (R. 190).

On March 11, 2004, Dr. David Lipsitz examined Plaintiff and performed an EGD. He noted that Plaintiff had two persistent gastric ulcers that appeared benign. (T. 181). He further noted that they had not healed on Protonix, likely because "the patient has been taking non-steroidal anti[-]inflammatory agents for arthritic complaints." (R. 181). Dr. Lipsitz recommended increasing the Protonix to twice a day, avoiding NSAIDs or switching to one of the COX-2 inhibitors. (R. 181). The biopsies of the two ulcers were benign. (R. 183-185). Dr. Lipsitz' final diagnosis was mild chronic gastritis with acute inflammatory exudate consistent with nearby ulcer. (R. 185).

A consultative Functional Capacity Evaluation performed on May 14, 2004 by J. Love indicated that Plaintiff could occasionally lift ten pounds, could frequently lift less than ten pounds, could sit for six hours in an eight-hour work day, could stand six hours in an eight-hour work day, and was unlimited with regard to other functions (R.116-123.). He also stated that "[i]t is reasonable to conclude her pain may cause limitations in lifting and carrying yet she says she can lift up to 20 pounds. Her allegations of significant limitations is only partially credible." (R. 121).

On July 24, 2004, Plaintiff returned to Dr. Gelacek complaining of polyarthralgias. (R. 293). Dr. Gelacek requested that Plaintiff obtain blood work including a Sed rate, ANA, latex, Lyme titer, complete blood count, TSH, and lipids. (R. 293). Dr. Gelacek noted that Plaintiff's lungs were clear, but that she had chronic obstructive pulmonary disease. (R. 293).

On July 26, 2005, Plaintiff had a MRI of her lumbar spine that indicated "moderate size right-sided far lateral L4-5 disc protusion." (R. 302). The MRI indicated no disc protrusion or spinal stenosis at any other level. Additionally, there was a decreased signal from the "L2-3, L3-4, L4-5 discs consistent with degenerative disc disease" and "mild to moderate diffuse facet arthropathy." (R. 302).

On July 27, 2005, Plaintiff saw Dr. Devashis Mitra of the Osteoporosis Center. Dr. Mitra noted that Plaintiff suffered from low back pain, osteoarthritis, muscle spasm of the spine, and sleep difficulty (R. 333). He recommended the addition of Parafon for pain and diazepam to help with Plaintiff's sleep difficulty and to serve as a muscle relaxant. (R. 333).

A Functional Capacity Evaluation was performed on Plaintiff by a physical therapist at Westarm Therapy Services on October 19, 2005 and was signed by Dr. Mitra on November 2, 2005. The evaluation indicated that Plaintiff could occasionally lift from waist to shoulder 10 pounds, pull 10 pounds, and carry 10 pounds, and sit and stand about 6 hours in an 8-hour day with frequent position changes. (R.324-332). Additionally, it indicated that she could occasionally climb stairs, kneel, crawl, reach above shoulder level, and reach below shoulder level. (R.327). Further, it was indicated that Plaintiff could use her right and left hand frequently for fingering, and handling. (R. 130). The physical therapist opined that Plaintiff was capable of part-time sedentary work, but noted that there was a positive indication for 3 out of 5 categories on the Waddell Symptom Magnification Rating test for distracted straight leg-raise, over-reaction and cog-wheeling, and simulated trunk rotation. (R. 326, 331-332.) The grip testing was also somewhat equivocal. (R. 326).

At the hearing, Plaintiff testified that she was born on November 5, 1949 and was 56 years old (R. 361-362). She completed a GED program in 1974. (R. 362). Plaintiff was widowed in 1993 (R. 362). Plaintiff's employment history is as follows: (1) she was employed

as an administrative assistant at a pharmacy from 1999 until September 2003 when the pharmacy sold to Omnicare; (2) Plaintiff was employed as a dairy department manager from 1995 to 1999; (3) from 1993 to1995, she was employed as a grocery clerk/cashier; and, (4) Plaintiff was employed as a dairy department assistant from 1988 to1993. (R. 364- 367). Plaintiff testified that she takes aspirin for blood thinning, Trazadone and Propoxyphene for back pain, Lexapro for anxiety and depression, Zyprexa for allergies, and Diazepam to sleep at night. (R. 374-377). She further stated that the Lexapro, Trazadone, and Zyprexa make her drowsy and she must lay down about half of the day. (R. 377). In 2001, Plaintiff was diagnosed with hyperthyroidism. (R. 373).

With regard to her daily activities, Plaintiff testified that she does her own dishes, dusts, runs a handheld sweeper, mops, does laundry once a week, and makes her bed. (R. 377, 379). She can bathe and dress herself. (R. 378). In the evenings, Plaintiff sits and watches television, but can only sit for about a half hour at a time. (R. 378). Plaintiff testified that he must lay down about half of the day, (R. 377) and she gets only two hours of sleep at a time. (R. 388). Plaintiff further testified that she has a driver's license but could only drive for twenty minutes at a time (R. 378-379). Plaintiff does her grocery shopping but her sister carries the bags. (R. 380). She attends church once a week (R. 381), and she used to walk and bowl quite a bit. (R. 389).

The ALJ concluded that:

1.  The claimant met the disability insured status requirements of the Act on September 5, 2003, the date the claimant stated she became unable to work, and continues to meet them through December 31, 2008.

2.  The claimant has not engaged in substantial gainful activity since alleging disability on September 5, 2003.

3.  The medical evidence establishes that the claimant has severe impairments consisting of lumbar disc disease and peptic ulcer disease, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The evidence also shows the claimant has a history of chronic obstructive pulmonary disease, osteopenia of the left hip, hypothyroidism, headaches, and anxiety/depression; however, these additional impairments do not have more than a minimal impact on the claimant's ability to perform work related activities and are therefore "non-severe."

4.     The claimant's allegations of totally disabling exertional and non-exertional limitations and pain, when considered in accordance with Social Security Regulation 404.1529 and Social Security Ruling 96-7p, are not fully credible and are not consistent with the clinical and objective findings, her self reported activities of daily living, her overall testimony, and the other evidence of record.

5.     The claimant has the residual functional capacity to perform the physical exertional and non-exertional requirements of work except for work requiring lifting and carrying objects weighing more than 20 pounds, more than occasional crouching, any crawling or climbing of ladders, ropes or scaffolds, more than occasional pushing/pulling with the lower extremities, including the operation of pedals unless the force required to operate the pedal is less than five pounds, prolonged exposure to cold temperature extremes or extremes of wetness/humidity, or exposure to dangerous machinery and unprotected heights.

6.     The claimant's past relevant work as an administrative assistant, department manager, assistant manager, and cashier, did not exceed the above limitations.

7.     The claimant's impairments do not prevent the claimant from performing her past relevant work as an administrative assistant, department manager, assistant manager, or cashier as those jobs are customarily performed in the national economy.

8.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision. (20 C.F.R. 404.1520(e)).

(R. 27).


**IV.   STANDARD OF REVIEW**

The standard of review in a social security case is whether substantial evidence exists in the record to support the Commissioner's opinion. *Allen v. Bowen*, 881 F.2d 37, 39 (3d Cir. 1989). Substantial evidence has been defined as "more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Additionally, if the Commissioner's findings of fact are supported by substantial evidence, they must be accepted as conclusive. 42 U.S.C. 405 (g); *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In making this determination, the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by

supplying additional facts from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ. *Fargnoli v. Massarini*, 247 F.3d 34, 44 n.7 (3d Cir. 2001).

When resolving the issue of whether a claimant is disabled and whether the claimant is entitled to DIB benefits, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. § 404.1520. The Supreme Court summarized this five step process:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920 (f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

## IV. DISCUSSION

Here, the ALJ ended his review of Plaintiff's claim at the fourth step, concluding that Plaintiff could return to her "past relevant work" as an administrative assistant, department manager, assistant manager, or cashier. Plaintiff challenges the ALJ's conclusion that her impairments do not render her incapable of any form of gainful employment. Specifically, she contends that the ALJ did not give the appropriate weight to the opinions of her treating rheumatologist nor to the functional capacity evaluations of the state agency adjudicator and West Arm Therapy/Dr. Mitra. Plaintiff argues that had the ALJ given such opinions their proper weight, her residual functional capacity would have been limited to "sedentary" work, rendering her disabled under Medical Vocational Rule 201.14.

The ALJ determined that Plaintiff could return to "past relevant work" in jobs that essentially fall into the category of "light work". The light work category is described in the regulations as follows:

> (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm and leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R.§ 404.1567.

When determining a plaintiff's residual functional capacity, the ALJ must determine the weight to be given to the evidence. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 422, 429 (3d. Cir. 1999)(quoting, *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). However, for controlling weight to be given to the opinion of a treating physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and [ ] not inconsistent with other substantial evidence." 20 C.F.R. §404.1527 (d)(2). There are several factors that the ALJ may consider when determining what weight to give the opinion of the treating physician. 20 C.F.R. §404.1527. They include the examining relationship, treating relationship, supportability, consistency, specialization, and other factors. 20 C.F.R. §404.1527 (d). Therefore, a treating physician is not entitled to controlling weight in every instance.

The record indicates that Plaintiff visited Dr. Mitra only on July 27, 2005. (R. 332). Though he subsequently signed a Functional Capacity Evaluation on November 2, 2005, Dr.

Mitra was not present when the Evaluation was performed.[1] (R. 332- 333.) The Functional Capacity Evaluation was completed by West Arm Therapy Services. (R. 324-332). In his office notes, Dr. Mitra noted that Plaintiff suffered from low back pain, osteoarthritis, muscle spasm, and sleep difficulty. (R. 333). He reviewed x-rays of Plaintiff's lumbar spine noting that it showed osteoarthritis/disc degeneration. He also noted that she "[d]enies weakness of any extremity, paresthesiae, bladder or bowel symptoms. The pain is moderate on the whole. It is localized without radiation. She has intermittent pain in her neck and shoulders. Denies morning stiffness. Denies temporal headaches, scalp tenderness, visual disturbances and jaw claudication. There is no joint swelling. She is on Dravocet with some relief but not enough." (R. 333). Dr. Mitra signed the Functional Capacity Evaluation prepared by West Arm indicating that "I have read the above FCE and agree with the conclusions stated above" essentially categorizing Plaintiff as being capable of part-time sedentary work. (R. 324-332).

The record as assessed by the ALJ, however, contradicts Dr. Mitra's opinion. With regard to Plaintiff's osteoarthritis, Dr. Gelacek indicated that Plaintiff suffered from no neurological problems. (R. 293). Further, results of Plaintiff's blood work was negative for rheumatoid arthritis. (R. 292.). While an MRI in July of 2005 indicated a right-sided far lateral disc protrusion at L4-5, it was moderate sized and no evidence of spinal stenosis was discussed. (R. 302). Additionally, Plaintiff's Functional Capacity Evaluation by West Arm indicated that she was magnifying her symptoms.[2] (R. 326). Specifically, she tested positive in three Waddell

---

[1]Plaintiff claims that the absence of Dr. Mitra at the Functional Capacity Evaluation should not considered as support for the ALJ's weight of the evidence assessment. However, this is a fact of record. Dr. Mitra was not present to observe the tests performed by West Arm's physical therapist. Therefore, Dr. Mitra was relying on the opinions of another when he signed the document even if he combined those opinions with his own. Plaintiff has provided no law in support of her argument.

[2]Plaintiff asserts in both her brief and reply brief that the ALJ failed to explain the significance of the positive Waddell testing in his decision. However, the ALJ referred to this significance in his reference to Exhibit 17F which is the West Arm/Mitra Functional Capacity Evaluation. Under the sub-heading of "Special Tests", the physical therapist noted as follows:

> Waddell testing is as follows: (please see Waddell Symptom Magnification
> Rating Sheet): tenderness was negative, simulation was negative for axial
> loading, positive for simulated trunk rotation with an increase in (R) low back

(continued...)

9

Symptom Magnification categories for straight leg-raises, over-reaction and cog-wheeling, and simulated trunk rotation. (R. 326). West Arm also indicated that the results of her grip testing were somewhat equivocal. (R. 326). Plaintiff indicated in her work history report that she was capable of lifting "no more than 20 lbs. at the most," which is the maximum lifting requirement for light work. (R. 98).

Plaintiff's gastric ulcer condition similarly did not preclude her from light work. In January 2002, an endoscopy showed mild gastroesophageal reflux disease. (R. 139). In March 2003, Plaintiff was prescribed Nexium by Dr. Gelacek and Plaintiff reported relief from her symptoms. (R. 195). Plaintiff's bloodwork indicated that she was positive for H. Pylori and was given triple antibiotic therapy. (R. 195). This therapy was repeated once she started Actonel. (R.

---

[2](...continued)
pain noted with rotation to either side, distracted straight leg raising was positive (open chain knee extension (L) and (R) was [illegible]8" without change in pain, passive straight leg raise (L) 55" with hamstring tightness and (R) low back pain, straight leg rais[e] (R) to 50"? complaint of pain). Regional testing was positive for weakness with cogwheeling but was negative for sensory testing, over-reaction was positive. Please note this adds up to a total of 3 out of 5 Waddell Categories. Please also note that grip testing using the Jamar dynameter was not a smooth bell curve on the (R) side; the (L) side was also somewhat equivocal. Hawkins Test for both shoulders was somewhat equivocal, there was 7 pain more in the posterior shoulder blade area on the (L) and (R) sides. Please note that although the patient notes that her walking tolerance is approximately 10 minutes she only walked at a little more than 1 minute on the treadmill at the lowest possible speed .5 to .6 miles per hour.

(R. 326.)

The physical therapist went on to include this information in a "Validity Profile" near the end of the report:
VALIDITY PROFILE: Please note that there are 3 out of 5 positive Waddell Categories. Grip testing also did not indicate a clear bell curve primarily on the right side on this patient. Please note also that Borg Rated Perceived Excursion Scale did not closely match the patient's heart rate, in fact the Borg rating of 13 should bring a heart rate of close to 130 (for example on lifting floor to waist Borg RPF. was 13 yet heart rate was only 72/min). On carrying for example the patient rate her exertion on the Borg scale at 17. This should equal a heart rate of somewhere around 170 (yet measured/palpated Heart rate was 88/min).

(R. 332.)

Plaintiff has not suggested that the ALJ was not warranted in considering the Functional Capacity Evaluation as a whole in his decision. In fact, she repeatedly claims that the ALJ did not adequately consider the Functional Capacity Evaluation. However, in this instance, the ALJ considered the findings of the physical therapist/Dr. Mitra and the effect that the "Validity Profile" had on the other portions of the Functional Capacity Evaluation. As such, the ALJ was entitled to rely on the testing as interpreted by the physical therapist.

193). The abdominal ultrasound and UGI performed at the time were normal except for mild gastroesophageal reflux. (R. 202-203). A CT scan of her pelvis and gallbladder were negative. (R. 201). An EGD was performed by Dr. Lipsitz where he tested her two ulcers which were found to be benign, and he recommended that she stop taking NSAIDs and aspirin so that she could respond to Protonix. (R.181). Lipsitz also diagnosed her with mild chronic gastritis. (R.183-85.) There is no further evidence in Plaintiff's medical records that she did not experience relief from the Protonix. In fact, the final record of Dr. Gelacek indicated that the purpose of her visit was entirely unrelated to her gastric condition. (R. 293).

This medical evidence is coupled with the fact that Plaintiff testified that she was capable of a number of daily activities that she performed on a regular basis. While Plaintiff claims that these activities were sporadic and transitory, she provides no evidence to support her contention. Plaintiff's activities include mopping, sweeping with a small sweeper, making her bed, doing laundry and dishes, grocery shopping, attending church, occasionally eating out and attending movies, using a computer, paying bills, and driving. (R. 377-381). These activities and the medical evidence are contradictory to Dr. Mitra's opinion that Plaintiff is limited to part-time sedentary work. Therefore, the ALJ gave the appropriate weight to Dr. Mitra's opinion.

Considering the medical evidence above, it is also clear that the ALJ correctly assessed the information contained within the West Arm/Mitra Functional Capacity Evaluation. In fact, when evaluating medical sources, the final disability determination is one that is reserved to the Commissioner, who must determine whether a claimant meets the statutory standard for disability set forth in the Act. 20 C.F.R. §404.1527 (e)(1). As such, special significance is not accorded to a medical source's statement that an individual is disabled. 20 C.F.R. § 404.1527. This is especially true in this instance since West Arm reported that Plaintiff was magnifying her symptoms and the remaining observations of the physical therapist are not consistent with the medical record. (R. 326).

Plaintiff also contends that the ALJ erred in failing to discuss Plaintiff's thirty-two year work history in his credibility determination. In her brief, Plaintiff states, "[a]s the ALJ failed to

mention her extensive work history, it is unknown whether he even considered it in his credibility determination." (Pl. Brief at 24). The Court disagrees. In his decision, the ALJ stated, "[f]inally, the Administrative Law Judge has examined the claimant's work record and notes the claimant had fairly consistent earnings through her alleged onset date. However, the clinical and objective findings rebut the claimant's contention that she is totally disabled from all form of gainful employment." (R. 24).

The Third Circuit standard for consideration of Plaintiff's credibility for complaints of subjective pain requires, "(1) that subjective complaints of pain be seriously considered, even where not fully confirmed by objective medical evidence...(2) that subjective pain 'may support a claim for disability benefits'...(3) that when such complaints are supported by medical evidence, they should be given great weight...and finally (4) that where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence." *Ferguson v. Schweiker,* 765 F.2d 31, 37 (1985) (internal citations omitted).

There are a number of non-medical factors that also may be considered when determining a plaintiff's credibility, including statements by plaintiff, daily activities, and efforts to work. 20 C.F.R. §404.1529. The ALJ thoroughly considered the medical record, as was discussed above, along with other sources of evidence. Plaintiff's work history is not dispositive of the question of Plaintiff's credibility. It is only one of many factors that may be considered, and as evidenced by the ALJ's decision, was considered. Therefore, Plaintiff's argument that the ALJ did not appropriately consider her past work history fails.

Finally, Plaintiff argues that the ALJ's statement that the State Agency adjudicator was not a physician was contradictory to the practice of the Commissioner in processing claims. With regard to the adjudicator, the ALJ stated as follows:

> Pursuant to Regulation 404.1527 and Social Security Ruling 96-5p, when evaluating medical opinions regarding an individual's disability, consideration of all medical opinion evidence must be made. In deciding the weight given to any medical opinion evidence, the Administrative Law Judge must consider the examining relationship, treating relationship, supportability, consistency, specialization and other factors that tend to support

> or contradict opinion evidence....
>
> In this regard, the Administrative Law Judge initially notes that the State Agency adjudicator is a non-physician; therefore, his opinion is not entitled to controlling weight or special significance.

(R. 25).

As the ALJ properly noted, Mr. Love did not qualify as an acceptable medical source within the meaning of the Act as he is not a licensed physician. Individuals whose opinions are considered "acceptable medical sources" and entitled to substantial weight in certain circumstances include licensed physicians or psychologists and are the only sources whose opinions can establish a medically determinable impairment. *Social Security Ruling ("SSR") 06-03p*, 2006 WL 2329939 at *1-2 (S.S.A. 2006). Mr. Love was considered as an "other source" under 20 C.F.R. § 404.1513 (d)(1).

It is within the purview of the ALJ to make a final determination as to the residual functional capacity of a claimant. 20 C.F.R. §404.1546 (c). Plaintiff delineates no policy that would contravene the power of the ALJ to make this determination. Opinions of non-physicians are not entitled to the same weight as an "acceptable medical source." *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir.1999). However, their opinions may be considered in the determination. *Id.* The ALJ considered the adjudicator's opinion but found that it was outweighed by the medical evidence in this case.

Because this Court agrees with the ALJ's determination that Plaintiff is capable of returning to her "past relevant work" and finds that the ALJ's decision is supported by substantial evidence, it is unnecessary for the Court to assess whether Plaintiff would in fact be disabled under Medical Vocational Rule 201.14 if she were to be limited to sedentary work.

**V.    CONCLUSION**

Based on the foregoing, the motion for summary judgment filed by Defendant Commissioner of Social Security shall be granted.  The motion for summary judgment filed by Plaintiff shall be denied.  An appropriate order will follow.


s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Karl E. Osterhout, Esquire
1789 South Braddock Avenue
Suite 570
Pittsburgh, PA 15218

Lee Karl
Assistant United States Attorney